## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MIGUEL E. MAEZ,

       Plaintiff,

v.                                      CV 13-381 WPL

CAROLYN W. COLVIN, *Acting
Commissioner of the Social Security
Administration*,

       Defendant.

## MEMORANDUM OPINION AND ORDER

Miguel Maez filed an application for Disability Insurance Benefits ("DIB") on April 16, 2009, and for Supplemental Security Income ("SSI") on April 22, 2009. (Administrative Record ("AR") 38.) He alleges disability beginning April 6, 2009, due to heart problems, high blood pressure, and heart surgery that took place on April 6, 2009. (AR 168.) Administrative Law Judge ("ALJ") Ann Farris held a disability hearing on July 22, 2011. (AR 52-78.) On September 23, 2011, the ALJ determined that Maez was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 38-47.) Maez filed an appeal with the Appeals Council, but the Council declined his request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 7-13.)

Maez sought review of the SSA's decision (Doc. 1) and filed an opposed Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for Rehearing (Doc. 20). The Commissioner of the SSA ("Commissioner") responded (Doc. 21), and Maez filed a reply (Doc. 22). After having read and carefully considered the entire record and the relevant law, I

grant Maez's motion and remand this case to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2014). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a

claimant's impairments are not equal to those in the Listing of Impairments, then, as part of step four, the ALJ determines the claimant's residual functional capacity ("RFC").  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).  In the fourth step, the ALJ compares the claimant's RFC with the functional requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from performing his past work, then he is not disabled. *Id.* If the claimant cannot return to his past work, then the Commissioner must show at the fifth step that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail). The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

## FACTUAL BACKGROUND

Maez is a forty-nine-year-old man with a tenth-grade education. (AR 133, 173.) He worked as a roustabout in oil fields from 1994 through 2008. (AR 169.) Maez was laid off from his roustabout work in December 2008, and he was not working on his alleged disability onset date of April 6, 2009. (AR 168.)

The record before the ALJ contained medical evidence dating from April 22, 2008, through July 20, 2011. The Appeals Council added a cardiology report from September 2, 2011, to the record. (AR 12.)

On April 22, 2008, Maez visited Presbyterian Medical Services ("PMS") in Farmington, New Mexico, for a checkup after he was air lifted to the University of New Mexico Cardiology

Clinic on April 14, 2008, for what he referred to as a "heart attack" or "hole in [his] heart." (AR 274.) Maez was assessed with cardiovascular disease and prescribed Norvasc and clonidine. (*Id.*) On May 1, 2008, Maez complained of feeling drained, and an EKG revealed sinus bradycardia (slow heartbeat).

On January 25, 2009, Maez underwent a head CT scan due to left arm numbness. (AR 305.) The results showed likely areas of small vessel disease and chronic ischemic change. (*Id.*) On April 3, 2009, Maez reported that he had taken his last clonidine, a high blood pressure medication, on February 9, 2009, because the drug just made him tired. (AR 272.) He also stopped taking Norvasc the previous summer because it was too expensive. (*Id.*) The physician prescribed metroprolol and clonidine.

Maez was admitted to the San Juan Regional Medical Center ("SJRMC") by ambulance on April 6, 2009, after he suffered an ascending aortic aneurysm and Type A aortic dissection. (AR 236, 414, 556.) He described the sudden onset of sub-sternal pain radiating to the back and rated his pain at 10/10. (AR 406, 413.) Maez was flown to the Heart Hospital of New Mexico, where he underwent a thoracic aortic dissection repair. (*See* AR 556.)

Maez returned to the Heart Hospital of New Mexico on April 15, 2009, complaining of lower back pain radiating to his chest. (AR 236.) He also experienced diaphoresis (perspiring profusely) and shortness of breath. (*Id.*) Maez remained hospitalized for three days for treatment of his malignant hypertension. (AR 239, 241.) Two to three weeks after his original aortic dissection, Maez suffered a Type B aortic dissection, for which he underwent stenting at the Arizona Heart Institute. (*See* AR 556.) In a function report dated April 22, 2009, Maez asserted that he experiences sleepless nights, that his wife needs to remind him to take his medicine, that his wife does all of the cooking and housework because he is not able, that he cannot go out

alone, that he does not spend time with others, and that he can only walk twenty-five feet before needing to rest. (AR 156-63.)

On May 11, 2009, Maez reported back and chest pain rated 8/10 at PMS, where he was assessed with a post-op sternal wound infection and referred to a cardiologist. (AR 271.) A week later, Maez had begun wound care treatments, and he described the same level of pain. (AR 270.) On June 4, 2009, George Hunt Peacock, M.D., found that Maez had a nonhealing sternal incision, and he performed a debridement (removal of infected tissue) of the incision. (AR 298.) On June 8, 2009, Maez complained to his primary care doctor, Timothy Muhonen, M.D., of a painful bump on the side of his chest. (AR 266.) Dr. Muhonen prescribed antibiotics and referred Maez to cardiology. (*Id.*)

Cardiologist Luther Weathers, M.D., performed an echocardiogram on June 9, 2009. (AR 388.) The echocardiogram showed an ejection fraction of fifty-five to sixty percent and mild to moderate concentric left ventricular hypertrophy. (*Id.*)

Maez reported to Dr. Muhonen on June 16, 2009, that his chest discomfort was better, though he had an episode of angina that lasted for two minutes. (AR 265.) On June 30, 2009, Maez complained of pain under his left breast with deep breaths, sleep, or direct pressure. (AR 264.) Dr. Muhonen assessed Maez with chest wall pain, controlled hypertension, angina, and depression, prescribing Paxil to treat the depression. (*Id.*)

In a function report dated July 8, 2009, Maez stated that he can no longer work, fish, ride bikes, play with his grandson, or do yard work; that he tosses and turns all night due to pain; that he loses his breath while dressing and must dress slowly; that he is too mean now to engage in social activities; that he cannot lift ten pounds; and that he cannot walk because he runs out of air. (AR 182-87.) On August 17, 2009, J. Pataki, M.D., a non-examining medical consultant,

provided a physical RFC assessment. (AR 398-405.) Dr. Pataki found that Maez must avoid concentrated exposure to extreme cold and that he can occasionally lift or carry ten pounds; frequently lift or carry less than ten pounds; stand, walk, or sit for a total of six hours in an eight-hour workday; push or pull without restriction, except as limited by his ability to lift or carry; and never climb ladders, ropes, or scaffolds. (AR 399-400.) He stated that Maez's "[a]lleged symptoms and limitations are at least partially credible." (AR 403.) Further, "[i]n view of the clinical history, the lifting requirement is justified in order to avoid sudden elevation of blood pressure with the associated risk of dissection." (AR 405.)

Maez returned to Dr. Weathers on September 22, 2009, complaining of significant pain in his sternum. (AR 520.) Dr. Weathers noted that Maez had swelling and that green-colored pus had been draining from his sternal wound. (*Id.*) Dr. Weathers assessed Maez with coronary artery disease with a history of myocardial infarction, aortic dissection status post surgical revision and subsequent sternal wound infection, and severe hypertension. (*Id.*) Dr. Weathers continued Maez's current medications, ordered blood tests, and referred Maez to Giraldina J. Trevejo-Nunez, M.D., to determine whether he needed additional antibiotics for his infection. (*Id.*) Dr. Trevejo of SJRMC assessed Maez with a Methicillin-resistant Staphylococcus aureus ("MRSA") infection and possible osteomyelitis (bone infection) of the sternum and prescribed Vancomycin. (AR 440.)

On October 5, 2009, Maez saw Melania Yeats, M.D., at SJRMC. (AR 483.) Dr. Yeats noted that Maez was receiving intravenous ("IV") antibiotics for his wound infection, and he was experiencing pain rated 9/10. (*Id.*) On October 19, 2009, Maez received a wound VAC (Vacuum Assisted Closure) to help with the healing process. (AR 477.) From October 2009 to February

2010, Maez went to SJRMC on average every two to three days for wound dressing changes and often for wound VAC treatments. (*See* AR 427-82.)

Meanwhile, Maez visited Dr. Weathers on December 28, 2009. (AR 518.) Dr. Weathers noted that Dr. Trevejo had taken Maez off of the wound VAC and discontinued IV antibiotics. (*Id.*) However, the wound resumed discharging fluids, and the wound VAC was reapplied. (*Id.*) Dr. Weathers also noted that Maez was experiencing positional and pleuritic chest pain and severe hypertension. (*Id.*) On January 8, 2010, Maez expressed that he was having financial difficulties, and he was having trouble affording the gas to come to his appointments for wound dressing changes. (AR 422.)

On February 15, 2010, Maez reported his pain to be 5/10, sharp and stabbing. (AR 452.) Dr. Peacock assessed Maez with a nonhealing sternal wound and conducted a debridement of the wound. (AR 605.) Maez then underwent a bone scan on February 24, 2010, pursuant to Dr. Yeats's orders to evaluate for osteomyelitis. (AR 450, 696.) The test could not completely exclude osteomyelitis. (AR 450.)

Dr. Muhonen's notes from March 1, 2010, indicate that Maez tested positive for Hepatitis C and had done so for the past three years. (AR 487.) A CT scan on March 30, 2010, revealed distal sternal osteomyelitis. (AR 545-46.) Paul Levy, M.D., of the New Mexico Heart Institute performed a surgery consultation the same day. (AR 556-58.) Dr. Levy noted that Maez felt tired and had chest pain, dyspnea, orthopnea, muscle weakness, myalgias, intermittent leg claudication, and dizziness. (AR 557.) Dr. Levy recommended that Maez undergo a debridement of the sternum. (AR 558.) Dr. Levy performed the procedure on April 7, 2010, removing two sternal wires, thoroughly cleaning the region of chronic osteomyelitis, cleaning the wound to fresh wound edges, and replacing the wound VAC. (AR 563.) The same day, Maez visited

infectious diseases specialist Thomas C. Roberts, M.D., at Lovelace Medical Center. (AR 561-62.) Dr. Roberts noted that Maez had "probable chronic sternal osteomyelitis" and ordered the placement of a PICC line for another course of antibiotics lasting at least six weeks, the continuation of other medications, and waiting for lab results. (*Id.*)

Maez's blood pressure was 170/88 at a checkup with Dr. Muhonen on April 14, 2010. (AR 817.) Dr. Muhonen noted that Maez gets short of breath easily and completed forms required for Maez to obtain a handicapped parking permit. (*Id.*) Maez had his sternal wound debrided again on April 19, 2010. (AR 608.) He continued to visit SJRMC for dressing changes. (AR 757.) His blood pressure was still quite high at an April 21, 2010, appointment with Dr. Yeats. (AR 758.)

On April 23, 2010, Maez went to the SJRMC emergency room complaining of chest pain that began suddenly and dyspnea on exertion. (AR 573-74.) He described the pain as 7/10, squeezing, located in the right chest area, and radiating to the right shoulder and arm. (AR 573.) Chest x-rays revealed no abnormalities—the reason for Maez's sudden pain remained unknown. (AR 578, 583.)

Maez visited Dr. Levy again on May 4, 2010, at the request of Dr. Weathers. (AR 566.) Dr. Levy wrote that Maez was generally doing well, except that he had pain in the right chest that made him a little short of breath. (*Id.*) While Maez was returning to normal activity, he was not walking on a regular basis, and he reported fatigue, recent weight gain, chest pain, dyspnea, orthopnea, muscle weakness, myalgia, soft tissue swelling, dizziness, and limb weakness. (AR 567.) Dr. Levy found that the sternal wound was healing well with the wound VAC and that Maez was "doing well at this point in his recovery." (*Id.*) He recommended cardiac rehabilitation and follow-up appointments with Maez's other doctors. (*Id.*)

8

On May 17, 2010, Dr. Peacock examined Maez and found that the wound looked "pretty good." (AR 606.) Dr. Peacock found no odor, inflammation, or exudate, but he did remove a moderate amount of fibrin from the ulcer base. (*Id.*) One week later, Dr. Peacock examined Maez again and reviewed a lab culture that showed that Maez had another MRSA infection. (AR 603.) Dr. Peacock noted that Maez complained of a lot more pain than would be expected in the absence of the MRSA infection. (*Id.*) Dr. Peacock dealt with a draining ulcer by removing fibrin and detritus and treated the site with a wound VAC. (AR 604.)

On June 3, 2010, Samuel Pallin, M.D., completed a case analysis for a disability determination. (AR 569.) Dr. Pallin noted that Maez had a wound infection, sternal osteomyelitis, and hypertension, all of which were treated aggressively. (AR 569.) However, he found that Maez was capable of performing sedentary work, in spite of the need for intensive wound care to treat the infection. (*Id.*)

On June 21, 2010, Dr. Yeats found that Maez's wound was healing nicely, though he continued to get tired quickly and experienced shortness of breath and swelling in his legs if on his feet for a while. (AR 749.) On June 30, 2010, Maez saw Dr. Muhonen; his blood pressure was still high at 150/86. (AR 816.) Maez continued to receive wound treatment care. (AR 747.) A July 23, 2010, chest bone scan showed healing of the median sternotomy. (AR 599.) Maez reported feeling good on August 12, 2010, and his hypertension was controlled. (AR 814.)

Maez entered a cardiac rehabilitation program on November 2, 2010. (AR 612-14.) Maez reported anxiety and chest wall pain rated 7/10, and the medical staff wrote that Maez was limited to lifting ten pounds. (AR 638, 640.) He was placed in the highest risk cardiac category due to his cardiac surgery with certain complications and a reduced functional capacity. (AR 621.) Maez reported pain in his back, neck, and/or shoulders during various rehabilitation

sessions. (AR 628, 630, 632.) With the rehabilitation exercise, he also experienced increased fatigue (AR 626, 628, 634) and his head sweat all day (AR 626).

Maez visited the SJRMC emergency room on February 4, 2011, for severe-onset chest pain and blood pressure of 198/114. (AR 590.) He was assessed with atypical right-sided chest pain and trapezius spasm. (AR 589.) A CT scan showed that Maez's aortic dissection repair was stable compared to previous scans. (AR 590.) Vivek Sharma, M.D., prescribed Toradol for pain management and adjusted some of Maez's blood pressure medications. (*Id.*)

Dr. Weathers ordered an echocardiogram on April 12, 2011. (AR 743.) The test revealed mild concentric left ventricular hypertrophy, abnormal interrogation of the arch and descending aorta, mild mitral annual calcification, and mild mitral regurgitation. (AR 743-44.) On July 20, 2011, Dr. Weathers wrote a letter addressed to "To Whom It May Concern," stating that he had seen Maez for coronary artery disease (two myocardial infarctions), severe hypertension, aortic dissection with repair, and post-operative sternal osteomyelitis. (AR 810.) Dr. Weathers opined that "[d]ue to complaints of chronic pain and extreme fatigue with ADL [activities of daily living], ongoing since the aortic dissection repair, it is my estimation that the patient will be unable to return to work." (*Id.*)

Maez saw Dr. Weathers on September 2, 2011, for a routine followup.[1] (AR 830-31.) Dr. Weathers noted that when Maez was just sitting, he was feeling better, but "with any amount of exertion he gets extremely out of breath." (AR 830.) Dr. Weathers wrote that Maez had a history of depression and suicidal ideation, which seemed to have improved. (*Id.*) He continued Maez's current medication and scheduled Maez to follow up in six months. (*Id.*)

---

[1] New evidence considered by the Appeals Council is part of the record for review. *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994).

### HEARING TESTIMONY

The ALJ held a hearing on July 22, 2011, at which Maez and Vocational Expert ("VE") Thomas Greiner testified. (AR 52-78.) Maez represented himself at the hearing. (*See* AR 55.)

The ALJ informed Maez of his right to representation at the hearing and gave him the opportunity to postpone the hearing should he wish to obtain representation. (AR 54-55.) Maez waived his right to representation at the hearing, stating, "I don't need one. . . . The doctor ain't ever going to let me go back [to] work. . . ." (AR 55-56.)

Maez testified that he had not worked since his alleged onset date "[b]ecause my aorta blew up. . . . [I]t's all cut up and it's put back together. I don't even know how I'm alive . . . ." (AR 59.) He stated that he is weak and tired and cannot do anything—even play with his grandson for five minutes—because he loses his breath and has no strength. (AR 60.)

The ALJ reviewed Maez's medications with him, and she asked whether he was still being treated for osteomyelitis, which he affirmed. (AR 62.) The ALJ then asked about Maez's treatment in Arizona in 2009. (*Id.*) The ALJ informed Maez that she did not have records for the Arizona Heart Institute. (AR 63.)

The ALJ asked whether there were certain things that tended to trigger Maez's pain or make it worse. (*Id.*) Maez responded that the doctors were still trying to figure out why he was "so beat up." (*Id.*) He testified that he cannot exercise because he is too weak and that he got sick after doing physical therapy. (AR 64.)

In order to relieve his pain, Maez takes medications, keeps his feet elevated, and sleeps with many pillows. (*Id.*) Maez testified that he lives with his wife and that he is able to drive but that he gets dizzy and can only go short distances. (AR 65.) He also stated that he fell walking up the five steps at his house a few days earlier, breaking his glasses. (AR 65-66.) He has an even

11

harder time going downstairs. (AR 66.) Maez testified that he can bathe or dress for ten minutes, though his wife runs his bath for him. (AR 66, 68.) He uses oxygen at night. (AR 66.) His wife does all the cooking and laundry, though he can go to the grocery store with her if he rides in one of the electric carts. (AR 67.)

Maez testified that for fun, he watches his grandson; tries to fix his grandson's bike tires if he gets a flat, though he can probably only fix one tire in a sitting; and watches his garden grow. (AR 68.) He can water the garden with a hose while seated but cannot weed. (AR 69.)

On a typical day, Maez gets up, showers, watches television, watches his grandson for a while when he finishes school at 3:00, watches his wife cook, and watches the 9:00 p.m. news if he is not asleep before then. (AR 69-70.) He testified that he is now a hateful person and does not like anyone around him because he cannot do the things that they can do. (*Id.*)

The ALJ noted mention of depression in the record and asked Maez whether he goes to counseling for depression. (AR 70.) Maez stated that he is depressed, and that one time he would have shot himself if he had a gun. He also testified that his wife does everything for him and that he was not taking any medications for depression. (*Id.*) Rather, Maez asserted that he was too busy taking other medications, including for his high blood pressure. (*Id.*) When the ALJ asked whether there was anything else he thought she should know about his conditions, Maez said no and reiterated his inability to do anything without assistance anymore. (AR 71.)

The ALJ next questioned the VE. (AR 73-77.) The ALJ asked the VE to assume a person of Maez's age, education, and work history who is limited to sedentary work; can only occasionally climb stairs, balance, and stoop; can never kneel, crouch, or crawl; and must avoid exposure to unprotected heights, dangerous machinery, and extreme heat and cold. (AR 73.) The VE testified that such a person could not perform Maez's previous work. (*Id.*) However, such a

12

person could perform sedentary, unskilled work including motor polarizer, vinyl assembler, and ink printer. (AR 73-74.)

The ALJ asked Maez if he thought he could perform such work. (AR 74.) Maez replied that he did not think anyone would hire him because he was not worth anything, could not even go outside to his garden by himself, and breathes hard. (*Id.*) The ALJ then asked whether Maez thought he could do a job where he had to remain seated, with a two-hour break, and then he would remain seated again. (AR 76.) Maez stated that he probably could do the work if he could get a job like that, but that his doctor probably would not release him to work. (*Id.*)

The ALJ stated that she would send for more records from SJRMC Cardiology and PMS because the record lacked some recent records.[2] (AR 77.) She noted that she had Dr. Weathers's letter from July 20, 2011. (*Id.*)

## THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Maez's application for benefits according to the sequential evaluation process. (AR 40-46.) At the first step, the ALJ found that Maez had not engaged in substantial gainful activity since April 6, 2009, the alleged onset date. (AR 40.) Then, at the second step, the ALJ concluded that he suffers from the severe impairments of status post aortic dissection repair with resulting sternal osteomyelitis, coronary artery disease, hypertension, and hepatitis C. (*Id.*) At step three, the ALJ found that Maez's combination of severe impairments did not equal one of the listed impairments. (AR 41.)

As part of step four, the ALJ then determined that Maez has the RFC to perform less than the full range of sedentary work that includes occasionally climbing or stooping but never

---

[2] On July 28, 2011, following the hearing, the ALJ requested all medical records from SJRMC dating October 2009 to the present. (AR 726.) The Appeals Council also added Dr. Weathers's September 2, 2011, report to the record. (AR 11.) The record does not reflect whether the ALJ requested additional records from PMS; however, Maez does not argue that any records are missing from PMS.

kneeling, crouching, crawling, or being exposed to extreme heat, cold, or hazards. (AR 41.) In making this finding, the ALJ summarized Maez's testimony at the hearing and then reviewed the medical records. (AR 42-45.) The ALJ noted Dr. Weathers's opinion that Maez would be unable to return to work. (AR 44.) However, she stated unclearly,

> I do not give Dr. Weathers' opinion that the claimant would be unable to return to work be inconsistent with the medical evidence. The question of disability is a matter reserved for the Commissioner. When normally controlling weight would be given to an opinion of disability from a treating physician it is not entitled if it is inconsistent with other substantial evidence of record.

(*Id.*) Instead, the ALJ adopted the State agency medical consultant's opinion that Maez is capable of performing certain sedentary work because she found that the medical evidence was consistent with such an RFC finding. (*See id.*) Further, the ALJ found that Maez had made inconsistent statements as to issues relevant to a finding of disability. (*Id.*) The ALJ cited a disability report from October 2009, wherein the reviewer observed no difficulties in "hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using hands, or writing." (*Id.*) Finally, the ALJ found that Maez had been treated for his medical problems, his symptoms were relatively controlled, and his subjective allegations of pain were not supported by objective medical findings. (AR 44-45.)

The ALJ concluded that Maez could not perform past relevant work as an oilfield roustabout. (AR 45.) Nonetheless, at step five, the ALJ found that considering Maez's age, education, work experience, and RFC, and the testimony of the VE, Maez could perform the work of a motor polarizer, final assembler, and ink printer. (AR 45-46.) As the ALJ determined that Maez could perform jobs existing in substantial numbers in the national economy, the ALJ concluded that Maez was not disabled. (AR 46-47.) Maez appealed the decision to the Appeals Council, but the Council found that Maez's reasons for disagreeing with the hearing outcome did

not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 7-13.)

**DISCUSSION**

Maez argues that the ALJ's finding that he is not disabled is contrary to his treating cardiologist's opinion, is unsupported by substantial evidence, and is contrary to law. Maez makes five specific arguments: 1) the ALJ violated the treating physician doctrine, 2) the ALJ failed to develop the record, 3) the RFC is contrary to the evidence and the law, 4) the ALJ's credibility conclusion as to Maez is contrary to the evidence and the law, and 5) the Appeals Council erred in rejecting new, material, and chronologically pertinent evidence.

## I.    Treating Cardiologist's Opinion

Maez argues that the ALJ failed to explain the weight she afforded to Dr. Weathers's opinion that due to chronic pain and extreme fatigue with activities of daily living, Maez will be unable to return to work. Maez asserts that remand is warranted simply on the basis that the ALJ's discussion of Dr. Weathers's opinion was incomprehensible. However, Maez also interprets the ALJ's inclusion of the phrase "inconsistent with the medical evidence" as indicating that she did not accord Dr. Weathers's opinion controlling weight. Maez thus argues that the ALJ failed to discuss certain factors provided for by regulation to determine the specific weight, if not controlling, to assign to Dr. Weathers's opinion. Finally, Maez argues that if the ALJ doubted Dr. Weathers's opinion, she was required to recontact him.

An opinion that a person is "unable to work" is not a medical opinion and is instead an issue fully reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Social Security Ruling ("SSR") 96-5p covers the consideration required by the ALJ of a treating

physician's opinion that a claimant is disabled or unable to work.[3] 1996 WL 374183 (July 2, 1996). "[A]djudicators must always carefully consider medical source opinions about any issue including opinions about issues that are reserved to the Commissioner." *Id.* at *2. Nonetheless, treating source opinions on issues reserved to the Commissioner may not be accorded "controlling weight or special significance." *Id.*

While the ALJ correctly declined to accord controlling weight to Dr. Weathers's assessment that Maez is unable to work, I must examine, as argued by Maez, whether the ALJ properly analyzed Dr. Weathers's opinion and explained the weight conferred for her evaluation. A treating physician's opinion on an issue reserved to the Commissioner "must never be ignored." *Id.* at *3. "[T]he [ALJ] must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." *Id.* That is, the ALJ must "review all of the medical findings and other evidence that support a medical source's statement that [a claimant is] disabled." 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Upon completion of such evaluation, the ALJ must, in "the notice of determination or decision[,] . . . explain the consideration given to the treating source's opinion(s)." SSR 96-5p, 1996 WL 374183, at *6. This explanation must "articulate [the] weight, if any," assigned to the treating physician's opinion. *Lopez v. Astrue*, 371 F. App'x 887, 891-92 (10th Cir. 2010) (unpublished) (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003)); *see also Knight v. Astrue*, 388 F. App'x 768, 772 (10th Cir. 2010) (unpublished) ("[The ALJ] must . . . provide an evaluation of the treating physician's opinion and state his reasons for either rejecting or accepting it."). If the

---

[3] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

record does not support a treating physician's opinion on an issue reserved to the Commissioner and the ALJ cannot determine the basis of the opinion from the record, the ALJ "must make every reasonable effort to recontact the source for clarification of the reasons for the opinion." SSR 96-5p, 1996 WL 374183, at *6 (quotation omitted).

I find multiple problems with the ALJ's treatment of Dr. Weathers's opinion. First, the ALJ did not show that she evaluated all of the evidence in the record to determine the extent to which Dr. Weathers's opinion that Maez is unable to work is supported by that record. The ALJ made no mention of Maez's June 9, 2009, and December 28, 2009, visits to Dr. Weathers and the relevant findings, nor did she recognize that Dr. Weathers saw Maez on September 22, 2009. Second, while apparent from her decision that the ALJ did not accord controlling weight to Dr. Weathers's opinion, the ALJ did not provide the weight, if any, that she accorded his disability opinion. Instead, the ALJ merely stated that a treating physician's opinion is not entitled to controlling weight where the opinion is inconsistent with other substantial evidence of record. (AR 44.) Finally, the ALJ did not provide an explanation of her evaluation of Dr. Weathers's opinion. The ALJ did not describe how Dr. Weathers's opinion was inconsistent with the medical evidence. For these reasons, I grant the motion to remand with the instruction that the ALJ evaluate all of the evidence in the record to determine the extent to which Dr. Weathers's opinion is supported by the record, state the specific weight accorded to Dr. Weathers's opinion, and explain why the opinion has been accorded such weight.  Further, if the ALJ finds that the evidence in the record does not support Dr. Weathers's opinion and the ALJ cannot find the basis for his opinion in the record, the ALJ is instructed to make "every reasonable effort" to recontact Dr. Weathers for clarification of the reasons for his opinion.

## II.        The ALJ's Development of the Record

Maez argues that the ALJ erred in failing to develop the record, claiming that the ALJ failed to request both medical evidence and additional hearing testimony. While the claimant has the burden of demonstrating that she is entitled to benefits, a social security disability hearing is nevertheless a nonadversarial proceeding. *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).  Therefore, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); see *Madrid*, 447 F.3d at 790.  The ALJ's "basic duty of inquiry" requires him "'to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts.'" *Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987) (quoting *Heckler v. Campbell*, 461 U.S. 458, 471, 471 n.1 (1983) (Brennan, J., concurring)). This duty is heightened when the claimant is proceeding pro se. *Younger on Behalf of Younger v. Shalala*, 30 F.3d 1265, 1267 (10th Cir. 1994) (citation omitted).

As to medical evidence, Maez asserts that the ALJ erred in failing to request records from the Arizona Heart Institute and that the ALJ should have ordered a consultative evaluation regarding his complaints of depression. With regard to consultative examinations, "the ALJ should order a consultative exam when evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability." *Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir. 1997). The ALJ noted mention of depression in the record (Dr. Muhonen assessed Maez with depression on June 30, 2009, and prescribed Paxil) and asked whether he attended counseling. (AR 70.) Maez responded that he did not attend

18

counseling or take medication for depression but that he was depressed and would have shot himself at one time if he had a gun. (*Id.*) Thus, the issue of depression was raised before the ALJ.

The Tenth Circuit has found that when a doctor diagnosed the claimant with depression, even where the claimant's applications do not assert depression, the ALJ is required to develop the record concerning depression. *Carter v. Chater*, 73 F.3d 1019, 1021-22 (10th Cir. 1996) (citing *Hill v. Sullivan*, 924 F.2d 972, 974-75 (10th Cir. 1991)). Based on Maez's prior diagnosis of depression, his Paxil prescription, and his statements at the hearing, there is a reasonable possibility of the existence of a disability, and a consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability. On remand, I instruct the ALJ to further develop the record as necessary with respect to the issue of depression.

As to the Arizona Heart Institute records, Maez has now obtained them. (*See* Doc. 22.) Because I have already found cause to remand this case, I do not examine whether the ALJ erred by not requesting the Arizona Heart Institute records. However, Maez may submit these records to the Commissioner on remand.

With regard to additional hearing testimony, Maez argues that the ALJ erred in failing to ask follow-up questions about when he experiences pain and whether his pain is exacerbated by certain activities. Because I have already found cause to remand this case, I do not examine whether the ALJ erred in not asking such follow-up questions. Maez will have the opportunity to provide such information on remand.

### III.  The Appeals Council's Rejection of Records Dated November 28, 2011 through January 24, 2012

Maez also argues that the Appeals Council erred in rejecting new, material, and chronologically pertinent evidence dated November 28, 2011, through January 24, 2012. The

Appeals Council rejected admitting the evidence into the record, stating that the "new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before [the date of the ALJ's decision]." (AR 8.) Maez states that the evidence would have contradicted the ALJ's original findings that the claimant's condition was stable, and the ALJ would have considered granting benefits. Indeed, the ALJ stated that "the medical evidence reveals that the claimant was treated and his symptoms have been relatively controlled." (AR 44.)

Evidence not before the ALJ may be presented to the Appeals Council and "becomes part of the administrative record to be considered when evaluating the Secretary's decision for substantial evidence." *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994). However, this "new evidence" must relate to the period on or before the date of the ALJ's decision. *See id.* at 858; 20 C.F.R. § 404.970(b) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."). "Whether [evidence] qualif[ies] as new, material, and chronologically pertinent is a question of law subject to [the Court's] *de novo* review." *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003) (citation omitted); *see also Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004).

Evidence is "new" when it is not "duplicative or cumulative." *Id.* (citation omitted). In *Threet*, the court found that evidence of claimant's further deterioration of her shoulder was new evidence that was not available to the ALJ at the time of his decision and was therefore not duplicative or cumulative. *Id.* Evidence is "material" "if there is a reasonable possibility that [it] would have changed the outcome." *Id.* (citation omitted). In *Threet*, the court found materiality

where the new evidence was contrary to the ALJ's determination that the claimant obtained no further medical treatment and that her condition had improved. *Id.*

Maez returned to the emergency room at SJRMC on November 28, 2011. (AR 21.) He points out that the later evidence shows that he underwent another aortic dissection repair, with carotid bypass at the Arizona Heart Institute in December 2011. (*See* AR 18.) Dr. Weathers's assistant noted on December 23, 2011, that while Maez stated that he was improving, he was also still experiencing "significant discomfort." (*Id.*) Maez's blood pressure was elevated, likely due to the discomfort. (AR 19.) On January 24, 2012, Dr. Weathers wrote that Maez had peripheral edema and that he was going to see if he could get Maez to a pain doctor. (AR 15.) The Commissioner argues that because the disputed evidence was dated after the ALJ's September 23, 2011, the Appeals Council did not err by not considering the evidence.

Upon *de novo* review of the later evidence, I find that the Appeals Council erred in failing to consider the evidence. First, the later evidence is new—not duplicative or cumulative—because the evidence was not available to the ALJ at the time of her decision. Second, the later evidence is material because it shows that Maez's symptoms were not "relatively controlled," but rather that Maez required another aortic dissection repair, continued to have high blood pressure, and experienced significant discomfort. Such new information suggests that there is a reasonable possibility that the evidence would have changed the ALJ's conclusion. Finally, the later evidence relates to the period on or before the date of the ALJ's decision because the evidence shows that his previous medical problems continued unresolved. On remand, I instruct the ALJ to consider the evidence dated November 28, 2011 through January 24, 2012.

**IV.     Remaining Arguments**

Maez makes two remaining arguments. First, Maez argues that the ALJ's RFC is contrary to the evidence and the law. Second, Maez asserts that the ALJ failed to properly assess his credibility. I do not address Maez's first argument because proper consideration of Dr. Weathers's opinion, further development of the record, and consideration of the medical records dated November 28, 2011, through January 24, 2012, may impact the RFC assessment. Likewise, I do not address Maez's second argument because the "finding as to . . . credibility may be undercut by reconsideration on remand of [Dr. Weathers's] opinion[], which . . . support[s] his subjective complaints." *Krauser v. Astrue*, 638 F.3d 1324, 1332 (10th Cir. 2011); *see also Chrismon v. Colvin*, 531 F. App'x 893, 902 (10th Cir. 2013) (unpublished) (finding that an assessment of credibility was linked to the ALJ's rejection of a medical opinion that was a topic for remand).

## CONCLUSION

The ALJ erred in failing to show that she evaluated all of the evidence to determine the extent to which Dr. Weathers's opinion that Maez is unable to work was supported by the record, in failing to state the weight that she accorded Dr. Weathers's opinion on disability, and in failing to explain her evaluation of the opinion. The ALJ also erred in failing to further develop the record as to depression, and the Appeals Council erred in failing to consider the records dated November 28, 2011, through January 24, 2012. I do not address Maez's remaining claims, which may be affected by the correction of the errors listed. I grant the motion to remand with instructions to the ALJ to evaluate all of the evidence to determine the extent to which Dr. Weathers's opinion of disability is supported by the record and to provide the weight accorded to his opinion, followed by an explanation of that weight. Further, the ALJ must consider the

records dated November 28, 2011, through January 24, 2012, and further develop the record as to depression.

      IT IS SO ORDERED.


_____
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.